UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JAMES H. KNOWLES,

    Petitioner,

v.                                     CASE NO. 8:06-CV-684-T-27EAJ

SECRETARY, DEPARTMENT OF
CORRECTIONS,

    Respondent.
_____/

## ORDER

Petitioner, an inmate of the Florida penal system proceeding *pro se*, initiated this action by filing a Petition for Writ of Habeas Corpus (hereinafter "petition") pursuant to 28 U.S.C. §2254 (Dkt. 1). Petitioner challenges his conviction for first degree murder entered by the Tenth Judicial Circuit Court, Polk County, Florida. Respondent has filed a response to the petition (Dkt. 11), and Petitioner has filed a reply thereto (Dkt. 20). The matter is now before the Court for consideration on the merits.

An evidentiary hearing is not required for the disposition of this matter. Rules Governing Section 2254 Cases 8(a) (2009). A recitation of the procedural history of Petitioner's criminal conviction is not necessary to the resolution of his habeas claims because Respondent does not dispute the timeliness of the petition or assert that the claims are not exhausted in state court.

### Standards of Review

Under 28 U.S.C. § 2254(d) and (e) as amended by the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA"), this Court's review of the state court's factual findings must be highly deferential. Such findings are presumed to be correct unless rebutted by clear and convincing evidence. Similarly, the state courts' resolutions of issues of law-including constitutional issues-must be accepted unless they are found to be "contrary to" clearly established precedent of the Supreme Court of the United States or involved an "unreasonable application" of such precedent. *Williams v. Taylor*, 529 U.S. 362 (2000). It is not enough that the federal courts believe that the state court was wrong; it must be demonstrated that the state court decision was "objectively unreasonable." *Id. Breedlove v. Moore*, 279 F.3d 952 (11th Cir. 2002).

**Ineffective Assistance of Counsel Standard**

To prevail on a claim of ineffective assistance of trial or appellate counsel, a Petitioner must meet the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland's* two-part test requires a Petitioner to demonstrate that counsel's performance was deficient and "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* However, if a claim fails to satisfy the prejudice component, the court need not make a ruling on the performance component.

## Discussion

In his petition, Petitioner raises three grounds for relief:

1. his conviction for first degree murder violated his right against double jeopardy and prosecutorial vindictiveness;

2. the state trial court erred and violated his attorney-client privilege, and his privilege against self-incrimination and confidentiality when it allowed Petitioner's expert witness to

testify for the State at trial; and

      3. his post-conviction counsel was ineffective in misadvising him regarding the consequences he would face if he prevailed on his motion to withdraw plea.

**Ground One**

In Ground One of the petition, Petitioner claims that his double jeopardy rights were violated in state court. Specifically, he argues that jeopardy attached when he originally entered his negotiated plea to second degree murder because the court received evidence before accepting his plea. Furthermore, he contends that where a defendant is charged with an offense and is convicted of a lesser offense which is necessarily included in the greater and arises out of the same occurrence, he may not thereafter be tried on the greater offense, whether the conviction of the lesser offense was by jury or by the court on a plea of guilty. Petitioner also claims that his conviction and sentence for first degree murder violates his protection against prosecutorial vindictiveness.

      a. Double Jeopardy

In state court, Petitioner raised his double jeopardy claim in his postconviction motion (Dkt. 11, Ex. 20). In denying the claim, the state trial court stated:

> As stated in Geiger v. State, 532 So. 2d 1298, 1300 (Fla. 2d DCA 1988):
>
> > When a defendant successfully challenges a plea and is permitted to withdraw a plea of *nolo contendere* or guilty which was entered as a result of a plea bargain, the bargain is 'abrogated' and the defendant must 'accept all of the consequences which the plea originally sought to avoid.'*Fairweather v. State*, 505 So. 2d 653, 655 (Fla. 2d DCA 1987).
>
> *See also* Sidell v. State, 787 So. 2d 139, 141 (Fla. 2d DCA 2001)("If the plea agreement is abrogated, Sidell may face the original charges."), and Ballard

v. State, 741 So. 2d 1212, 1213 (Fla. 2d DCA 1999)("Accordingly, we reverse
and remand with instructions to the trial court to allow Ballard to withdraw his
pleas. On remand, the State may again charge Ballard with the counts it nolle
prossed as part of the plea agreement.").

Based on the foregoing, the Court finds Defendant's being charged,
convicted, and sentenced for the first-degree murder in this case did not violate his
protection against double jeopardy.

(Dkt. 11, Ex. 21 at pgs. 2-3).

Petitioner's assertion that the trial court violated the Double Jeopardy Clause ("[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb") lacks merit. The Double Jeopardy Clause protects against a second prosecution for the same offense after acquittal or conviction, as well as against multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794, 800-801 (1989). Petitioner was not subjected to multiple punishments for the same offense. Nor was he subjected to a second prosecution after acquittal or conviction.

In Petitioner's case, he was charged with first degree premeditated murder and two counts of aggravated assault with a firearm (Dkt. 11, Ex.26, Vol. 1, pgs 7-10). He entered a nolo contendere plea to all charges pursuant to a negotiated plea agreement and was convicted of the lesser-included offense of second-degree murder and two counts of aggravated assault with a firearm. (Id. at pgs. 101-103). Petitioner was sentenced to thirty (30) years incarceration on the second degree murder count and five years on the aggravated assault counts, with all counts running concurrently. (Id. at pgs. 89-96).

Subsequently, Petitioner filed his Motion for Postconviction Relief in which he claimed that his trial counsel was ineffective for misadvising Petitioner about gain time eligibility (Id. at

pgs. 104-116). Following an evidentiary hearing, the state trial court granted Petitioner's motion for postconviction relief, vacated the plea and judgment, and afforded Petitioner a jury trial (Id. at Vol. II at pgs. 211-213). In its order granting the postconviction motion, the state trial court stated in pertinent part:

> In light of the serious consequences of withdrawing the plea in this particular case, the court then questioned the defendant as to his understanding of the ramifications of winning the motion. The court explained that the defendant would be facing first degree murder charges and a possible life sentence with a minimum mandatory of twenty-five years. The State relayed its ability to prosecute the defendant as charged and advised the court that the State would not consider any plea negotiations. Defense counsel also informed the court that he discussed, at length, the consequences of withdrawing the plea with the defendant. As a final precaution, the court took the motion under advisement and gave the defendant additional time to withdraw the motion. No such motion was submitted.
>
> ***
>
> Furthermore, the court has made the defendant fully aware that withdrawing his pleas would return him to the <u>status quo ante</u>, whereby he would face a life sentence should he subsequently be convicted, the State has made the defendant fully aware of its intentions, and the defendant nonetheless has expressed no reluctance in pursing [sic] the motion.

(Id.)(emphasis in original).

Petitioner's case proceeded to trial, and a jury found him guilty of first degree murder (Id. at pg. 224). Petitioner was sentenced to life in prison (Id. at pgs. 225-228).

The Double Jeopardy Clause does not relieve a defendant from the consequences of his voluntary choice. *Ricketts v. Adamson*, 483 U.S. 1, 10 (1987)(citation omitted). *See also, Williams v. Kemp*, 846 F.2d 1276, 1285 (11th Cir. 1988)("By withdrawing his plea, Williams and the state were returned to the position they occupied prior to the execution of the plea bargain when Williams stood charged with the murder..."). Despite being cautioned by both the state

5

trial court and his attorney about the possible consequences of withdrawing his plea, Petitioner voluntarily chose to do so. Consequently, there was no double jeopardy violation.

Petitioner does not demonstrate that the state court's decision rejecting Petitioner's double jeopardy claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Accordingly, Petitioner's double jeopardy claim does not warrant habeas corpus relief.

b. Prosecutorial Vindictiveness

Petitioner asserts that his conviction and sentence violate his protection against prosecutorial vindictiveness. In support of his assertion, Petitioner states that he "has been penalized by the imposition of a harsher sentence simply for exercising a right to appeal..." and "the prosecution vindictively prosecuted him for first degree murder[.]" (Dkt. 1 at pg. 6c of petition). Petitioner's prosecutorial vindictiveness claim has no merit.

"Due process of law...requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial." *North Carolina v. Pearce*, 395 U.S. 711, 725 (1969). In *Thigpen v. Roberts*, 468 U.S. 27 (1984), the Supreme Court stated that where a defendant is indicted on more serious charges while pursuing appellate or collateral relief on original charges, a presumption of prosecutorial vindictiveness, in violation of Fifth Amendment due process, arises. The facts in the instant case are distinguishable from *Thigpen*. *Thigpen* involved a defendant who was originally charged with misdemeanors and, pending appeal of the misdemeanor convictions, was charged with a felony. 468 U.S. at 30. In the instant case, Petitioner was charged with first degree murder.

Pursuant to a plea agreement, he pleaded guilty to and was convicted of second degree murder. He did not appeal his plea based conviction. Subsequently, he voluntarily chose to challenge his conviction for second degree murder and successfully had his plea withdrawn. Therefore, by withdrawing his plea, Petitioner and the state "were returned to the position they occupied prior to the execution of the plea bargain when [Petitioner] stood charged with [first degree] murder..." *Williams*, 846 F.2d at 1285.

"Sine qua non of a prosecutorial vindictiveness claim is that the second charge is a [sic] fact harsher than the first." *Miracle v. Estelle*, 592 F.2d 1269, 1275 (5th Cir. 1979)(citation omitted). In the instant case, the state did not charge Petitioner with a more serious charge while Petitioner was pursuing appellate or collateral relief on the original charge. The original indictment charged Petitioner with first degree murder, and after Petitioner voluntarily chose to withdraw his plea to second degree murder, he was again charged with first degree murder. The charge for which Petitioner stands convicted is no harsher than the original charge.

Furthermore, "[t]o establish prosecutorial vindictiveness, a defendant must show, through objective evidence, that (1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus." *United States v. Wilson*, 262 F.3d 305, 314 (4th Cir. 2001) (citations omitted), *cert. denied*, 535 U.S. 1053 (2002). "It is generally agreed that a finding of actual vindictiveness requires direct evidence, such as evidence of a statement by the prosecutor, which is available only in rare cases." *United States v. Dwyer*, 287 F. Supp.2d 82, 89 (D. Mass. 2003) (quotations omitted) (citation omitted). Petitioner's claim of prosecutorial vindictiveness is wholly conclusory, and he presents no facts or evidence that the prosecutor retaliated against him for exercising any legal right. Accordingly, Petitioner's

prosecutorial vindictiveness claim is wholly without merit and does not warrant habeas corpus relief.

**Ground Two**

In Ground Two, Petitioner asserts that the state trial court erred and violated his attorney client privilege, the privilege against self-incrimination and confidentiality when it allowed Petitioner's expert witness, Dr. Fried, to testify for the State at trial.[1] Petitioner raised this claim on direct appeal (Dkt. 11, Ex. 1). The Fifth Amendment states that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend V.

With regard to Petitioner's Fifth Amendment self-incrimination claim, the Florida Second District Court of Appeal stated in pertinent part:

> At his trial for first-degree murder, the evidence demonstrated that Mr. Knowles and the victim were married for the first time in 1981. They were divorced approximately two years later but continued to live together. During their marriage they had two sons. They remarried in 1991, were divorced again in 1994, and continued to live together until July 6, 1994.
>
> The murder occurred on September 19, 1994, when the events described above occurred. Mr. Knowles testified at trial that his wife had been unfaithful to him during their marriages, but he still loved her. He wanted to forgive her and reunite. Prior to going to his ex-wife's office on September 19, 1994, Mr. Knowles had purchased thirteen roses, one for each year of their relationship, and brought them with him to her office. He asked his wife to take him back, but she refused. She told him about her relationships with other men, some of whom were Mr. Knowles's friends, and she stated that he would never be able to forgive her for her actions. According to Mr. Knowles's trial testimony, Tina Knowles stated that "it wasn't just the one person, there's been others, and some of them are friends of yours, and when you find this out, we're going to go through all this again." Then, according to Mr. Knowles, "somewhere about that point I told her I loved her very much and I shot and killed her."

---

[1] Dr. Fried had been hired by Petitioner's counsel to determine Petitioner's sanity (Dkt. 11, Ex. 1 at pg. 2 of Petitioner's Initial Brief on direct appeal).

8

For two or three days prior to the shooting, Mr. Knowles had made arrangements for the handling of various affairs. He was not sure when this planning stage began-simply that he knew that he needed to "do something else." On cross-examination, Mr. Knowles agreed that if Tina had come back to him, he would not have killed her. He had unilaterally planned a reconciliation but admitted that "if that didn't happen, I knew I was going to die . . . and possibly Tina also." He admitted knowing that he had the gun with him (hidden by the bouquet of roses) when he went to see Tina and that it was his plan for Tina to die first.

His niece, Katherine Shockley, testified that shortly before the murder Mr. Knowles had given her a document designating her custodian of the boys in the event of the death of both of their parents. She stated that Mr. Knowles did not indicate that he intended to kill his wife, but he asked that she distribute certain guns to his boys. He left an undated, handwritten will, a note about payment for completion of work, a note about checks that were owed to him from his employer, and a temporary tag and lease agreement for a pickup truck. These items were recovered at his home pursuant to a search warrant.

Also recovered pursuant to the warrant were two audiotapes that were played to the jury in their entirety. In the tapes Mr. Knowles left certain instructions concerning the handling of his affairs after his death. In the first tape, he alluded to the fact that his boys would lose "two of us"-that he was "not going alone." He declared: "This is just something that I have decided that I have to do to be at peace with myself. I cannot be hurt anymore and will not be hurt anymore." The second tape contained the following statement: "I cannot handle this and have not handled it well at all. I just love Tina so much until I can't go on without her."

Finally, Dr. Freid testified, over defense objections, as the State's expert during the guilt phase of the trial. Dr. Freid testified as to Mr. Knowles's state of mind prior to the murder: he was depressed, quite upset, and especially disturbed about learning certain things about his wife's behavior. Therefore, Mr. Knowles developed an elaborate suicide plan. A couple of days later, however, Mr. Knowles changed his plans to include taking his wife's life as well as his own, and he made two audiotapes in which he recorded his intentions. On cross-examination, Dr. Freid reiterated that, in his opinion, Mr. Knowles was emotionally disturbed, very depressed, and struggling with the thought of losing his wife forever by divorce.

***

At the outset, we recognize that "the admission of testimony in violation of

9

a defendant's attorney-client privilege and privilege against self-incrimination creates a high probability of harm." Knowles (II), 848 So. 2d at 1059. Nevertheless, in this unique circumstance, we are convinced beyond a reasonable doubt that the error did not affect the first-degree murder verdict. In reaching that conclusion we have applied the harmless error test as set out in DiGuilio, 491 So. 2d at 1135, which "requires an examination of the entire record by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict."

We have already recited the permissible evidence that led to Mr. Knowles's conviction. Substantial, independent evidence of Mr. Knowles's premeditation emanated from the permissible evidence adduced, most notably from Mr. Knowles's own letters, audiotapes, and statements. Mr. Knowles's own testimony, as well as his written statement and audiotapes, revealed that, although he purportedly hoped for a reconciliation with his ex-wife, he simultaneously planned and expected to commit a murder/suicide. His focused and deliberate actions were inconsistent with a killing on the spur of the moment. See Spencer v. State, 645 So. 2d 377 (Fla. 1994). "Premeditation may be established by circumstantial evidence, including the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted." Holton v. State, 573 So. 2d 284, 289 (Fla. 1990) (cited in Spencer, 645 So. 2d at 381).

Both the audiotapes and his actions on the day of the murder confirmed Mr. Knowles's careful consideration of the murder/suicide plan. He made a will, arranged for custody of his soon-to-be orphaned sons, and made plans to dispose of some of his property. On the morning of the murder, Mr. Knowles calmly had coffee in a restaurant he frequented, purchased roses for his ex-wife and refused the suggestion that the florist deliver them, and walked into Tina Knowles's workplace with the gun concealed by the roses. He shot her once in the chest.

Admittedly, Dr. Freid testified about the moment at which Mr. Knowles might have formed an intent to murder his wife. But Dr. Freid also testified that Mr. Knowles was depressed, despondent, and upset, and that he hoped for reconciliation with his wife. Thus, the basic thrust of Dr. Freid's testimony was ameliorative. This is demonstrated not only by the fact that he was originally called as a defense witness at the first sentencing hearing in order to persuade the judge that Mr. Knowles's intent was less than full-blown premeditation, but also by the fact that the very last reference in the defense closing argument was to Dr. Freid's testimony:

10

> Now, he [the prosecutor] would have you believe that there
> was an elaborate plan. Well, the fact is, the evidence shows, that
> there were a number of plans, including the plan to wrap the
> pickup truck around the tree. Remember when Dr. Freid talked
> about how it was normal in situations like this to grasp at straws?
> That's what Dr. Freid said, that when you're in love, really in love,
> you seize every opportunity to believe that ultimately you're going
> to be successful. That's what the expert said. I suggest we believe
> him, and believe that he believed, right until the last minute, that he
> would succeed. Thank you.

As we stated in our opinion in Knowles (I), Dr. Freid testified that Mr. Knowles was legally sane at the time of the offense and knew that his conduct was wrong. However, Mr. Knowles's defense was not insanity but that he possessed a level of intent lower than premeditation. The defense, implicitly if not explicitly, conceded the wrongful nature of his conduct by seeking a conviction for a lesser crime. And, because the law presumes Mr. Knowles to be sane, Dr. Freid's testimony on this point only confirmed a legal presumption that was not before the jury to resolve. Knowles (I), 800 So. 2d at 264.

We went on to observe in Knowles (I) that the record contained no indication that Mr. Knowles's decision to testify was induced by the admission of Dr. Freid's testimony. Furthermore, an examination of Mr. Knowles's testimony reveals nothing suggesting that he was depressed or emotionally disturbed. The crucial evidence-for Mr. Knowles-concerning his mental state (that he was "emotionally disturbed," "depressed," and in fact "very depressed") was elicited from Dr. Freid. Mr. Knowles thus benefitted from the advantageous aspects of Dr. Freid's testimony without sacrificing his right to give the first and last closing arguments. Knowles (I), 800 So. 2d at 265.

DiGuilio suggests that an appellate court must look at the quality of both permissible and impermissible evidence, not simply the comparative weight of each. In the DiGuilio case, 491 So. 2d at 1138, the court noted that the "permissible evidence was not clearly conclusive" and that the impermissible evidence, "at least indirectly . . . highlighted for the jury the fact that DiGuilio was not testifying at trial and still had offered no plausible explanation" (for his presence in the middle of a drug deal). Here, the permissible testimony was conclusive. The defendant admitted that he took a loaded gun and shot his ex-wife. Although this originally might have been part of a murder/suicide plan, Mr. Knowles admitted that he intended to shoot Tina first and that if she had agreed to reconcile, he would not have killed her. Mr. Knowles left behind both audiotapes and written statements concerning his criminal intentions. In the face of this evidence, we are convinced beyond a reasonable doubt that Dr. Freid's

testimony-highlighting as it did the defendant's theory of his case-did not affect the jury's decision to convict Mr. Knowles of first-degree murder.

*Knowles v. State*, 864 So. 2d 1262, 1265-67 (Fla. 2d DCA 2004).

In short, the Florida Second District Court of Appeal concluded that admission of Dr. Fried's testimony violated Petitioner's attorney-client privilege and privilege against self-incrimination, but nevertheless concluded that the violation was harmless because the error did not effect the first degree murder verdict beyond a reasonable doubt.

The *Chapman v. California*, 386 U.S. 18 (1967) standard is the Florida standard for harmless error. *See Smith v. State*, 762 So. 2d 969, 970 (Fla. 2000)(citing *Goodwin v. State*, 751 So. 2d 537, 546 (Fla. 1999), *Chapman v. California*, 386 U.S. 18, 24 (1967), *State v. Lee*, 531 So. 2d 133, 136 n. 1 (Fla. 1988), *State v. Dodgily*, 491 So. 2d. 1129, 1135 (Fla. 1986)).

Under Florida law, "The harmless error test . . . places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." *Goodwin v. State*, 751 So. 2d at 540 (citing *Chapman*, 386 U.S. at 24).

In *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the Supreme Court set forth the federal habeas standard for relief where error is determined to exist. This test is "less onerous" than the harmless error standard enunciated in *Chapman v. California*, 386 U.S. 18 (1967). "The test is whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.' Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that

it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637. Any constitutional error that occurred in Ground Two would be harmless beyond any reasonable doubt based on the facts and the record herein. *See California v. Roy*, 512 U.S. 117, 339 (1996) (citing *O'Neal v. McAninch*, 513 U.S. 432 (1995)).

Petitioner testified at trial. He admitted that he went to his ex-wife's place of business and shot and killed her (Dkt. 11, Ex. 26, Vol. IV at pgs. 349-50). Petitioner admitted that when he went to see his ex-wife, "he had the gun on [him]." (Id. at pg. 361). Although Petitioner testified that he went to see his ex-wife because he "planned reconciliation" with her (Id. at pg. 350), he also testified that if the reconciliation "didn't happen," he "knew [he] was going to die" and "possibly [his ex-wife] also." (Id. at 351). When asked whether "[t]he plan was for [his ex-wife] to die first", Petitioner answered "[y]es, it was." (Id.).

Prior to shooting his ex-wife, Petitioner made an audiotape for his niece in which he stated in pertinent part that "[i]t's gonna be rough on them boys (Petitioner and his ex-wife's two sons), because they're gonna lose two of us. I'm not going by myself." (Id. at Vol. III at pg. 273). He also stated "maybe you can play this tape back for them (the two sons) when they get a little older and let them understand that I really did not mean to cheat them out of a father and a mother." (Id. at pg. 274). Moreover, he stated "[his ex-wife] has decided to split them up in this divorce, and I can't live with that. I don't want them separated, period." (Id. at pg. 275). Finally, Petitioner stated "I love you (the two sons) deeply, and I'm sorry, 'cause I am cheating both of you out of a mother and a father, and I hate that." (Id. at pg. 276).

Finally, on the day of the shooting, before Petitioner shot and killed his ex-wife, Petitioner went to his niece's place of business and dropped off a paper giving his niece custody

13

or guardianship of his two sons (Id. at pg. 172).

Assuming that Ground Two states a federal constitutional claim,[2] the result reached by the Florida courts, and a *Brecht* analysis reveals that the claim has no merit. Dr. Fried's disclosures were essentially cumulative of the other evidence revealed through Petitioner's testimony and his audio tapes and written documents. Even if it was error to admit Dr. Fried's testimony, Petitioner fails to demonstrate, in light of the entire trial record, actual prejudice under *Brecht*.

The state appellate court's decision is neither contrary to, nor an unreasonable application of, clearly established federal law. Likewise, the state court result is not an unreasonable result in light of the facts. Consequently, Ground Two does not warrant habeas corpus relief.

**Ground Three**

In Ground Three, Petitioner asserts that his postconviction counsel was ineffective in misadvising him regarding the consequences he would face if he prevailed on his postconvction motion in which he successfully sought withdrawal of his plea. Petitioner's ineffective assistance of postconviction counsel claim is without merit. There is no constitutional right to counsel in postconviction proceedings, *see Coleman v. Thompson*, 501 U.S. 722, 752 (11th Cir. 1991), and thus any alleged incompetence of postconviction counsel is not a ground for relief in federal habeas proceedings. 28 U.S.C.§ 2254(I) states as follows: "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not

---

[2]*See, e.g., Gibson v. Zahradnick*, 581 F.2d 75, 80 (4th Cir. 1978)("[A]n incriminating statement made during a psychiatric examination cannot be used to prove a defendant's guilt, whether the defendant or the prosecutor requested the examination and whether it was had for the purpose of determining competence to stand trial or sanity.").

14

be a ground for relief arising under section 2254." *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *Murray v. Giarratano*, 492 U.S. 1, 10 (1989). Likewise, in *Finley*, the Supreme Court refused to extend a due process requirement for effective collateral counsel to situations where a state has opted to afford collateral counsel to indigent inmates. *Id.*, 481 U.S. at 554-559. Accordingly, Ground Three does not warrant habeas corpus relief.

## Conclusion

For the foregoing reasons, the Court finds that Petitioner is not entitled to federal habeas relief.

ACCORDINGLY, the Court **ORDERS** that:

1. The Petition for Writ of Habeas Corpus is **DENIED** (Dkt. 1).

2. The **Clerk** shall enter judgment against Petitioner, terminate all pending motions, and close this case.

**DONE and ORDERED** in Tampa, Florida, on June 16th, 2009.

JAMES D. WHITTEMORE
United States District Judge

SA:sfc
Copy to: Petitioner *pro se*
Counsel of Record